Commonwealth *v.* Repyneck, Appellant.

Argued March 19, 1956. Before HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ. (RHODES, P. J., absent).

*Thomas A. McBride,* with him *Jackson M. Sigmon, McBride, von Moschzisker & Bradley* and *Mindlin & Sigmon,* for appellant.

*Edward G. Ruyak,* First Assistant District Attorney, with him *Elias W. Spengler,* District Attorney, and *Clinton Budd Palmer,* District Attorney, for appellee.

OPINION BY GUNTHER, J., July 17, 1956:

Appellant, Steve Repyneck, was convicted by a jury of the crimes of burglary and larceny in the Court of Oyer and Terminer of Northampton County. To estab-

lish guilt, the Commonwealth called as witnesses Ernest Dimler, the owner of the home burglarized; Stephen Konchick, an accomplice; and State policemen Sergeant John I. Swan and corporal Russell E. Dougherty, who investigated the circumstances of the crimes.

Ernest Dimler testified that he was the owner of the home at R.D. 20, Bethlehem, Pa., which was burglarized and owner of the bonds, money and jewelry taken. Ten bonds of the Lehigh Valley Coal Company, each in the amount of $1,000.00, some old money, stock certificates and many items of jewelry were taken amounting to approximately $20,000.00. He also testified as to the condition of his premises upon his return after the burglary had been committed.

Stephen Konchick testified in substance that he was introduced to a Frank Walls by the appellant in Marcus Hook. He and Walls got into a blackjack game at Marcus Hook, as a result of which Walls owed Konchick the sum of $800.00. Konchick later told appellant about the gambling debt owed him by Walls, whereupon appellant told Konchick not to worry about it; that the money could be obtained very easily at the Dimler residence; that the Dimlers were rich people who were away during the weekends and that he and Konchick could get the money there. Sometime later, appellant, Konchick and Walls arranged to burglarize the Dimler residence on a suitable weekend. Konchick further testified that on June 23, 1952, appellant drove him and Walls to the Dimler residence at about 9:30 P.M., where, according to pre-arranged plans, Konchick was to act as look-out man, Walls was to enter the dwelling and appellant was to drive around for stated times and return to pick up Konchick and Walls after the burglary had been committed. Konchick procured keys at his father's home, gave them to Walls and Walls entered the dwelling by using one of the keys, although

they made it appear as if they had gained entrance by jimmying a window. After the burglary, Konchick testified, he and Walls waited for appellant who later picked them up in his car. The stolen property was turned over to appellant. Sometime later, appellant gave Konchick five bonds and the jewelry. The jewelry was buried in the vicinity of appellant's home.

Sergeant John I. Swan testified that after Konchick was apprehended, at Konchick's request, he accompanied Konchick to appellant's residence located approximately a half mile from the Dimler residence. They found appellant in front of a garage near his home and there talked with him about the "Dimler job."

For reasons which appear later, this conversation of Sergeant Swan with appellant was an important link in the Commonwealth's case and are therefore set forth verbatim (R. 243a-244a):

"Q. And what did Konchick say to this man? A. 'The cops got me for the Dimler job. I want the jewels and stuff.' Repyneck said, 'They are not here. They are down the road about a mile.' I said, 'Let's get them.' Q. You said that to whom? A. I said that to Repyneck. Q. 'Let's get them?' A. 'Let's get them.' Q. Did he answer you? A. Yes he did. Q. What did he say to you? A. He said, 'Are you in a hurry? Let's wait until it gets dark. Are you in a hurry?' And I said 'Yes.' Q. Then what happened? A. Repyneck then pushed a motorcycle in the garage and came out. Then he spoke to Konchick. Q. What did he say? A. He said, 'I don't know what you are talking about. You are crazy. I don't know anything about any jewelry or stuff.' I said, 'You told me "down the road."' He said, 'I said nothing of the kind.' Konchick pleaded with him, 'Please, please.' Konchick said, 'Please, please, please.' Repyneck said, 'I don't want to talk to you. If you buried that stuff,' he said, 'go and find it.' Q. Then

what happened? A. Konchick and I started to walk towards the end of the barn, and he said, 'Do you have a warrant?' I said, 'No.' He said, 'Get off.' I said, 'You said the jewels were down the road,' But he walked away from me."

Corporal Dougherty testified in detail as to the condition of the Dimler residence the day after the burglary, which conclusively showed that the house was burglarized by someone. He also testified that he recovered some bonds from Konchick and some jewelry from his girl friend.

The appellant did not take the stand either to explain or contradict the Commonwealth's evidence. He called only one witness, an attorney, to testify that Konchick told him prior to appellant's trial that appellant had nothing to do with the burglary. Appellant also offered into evidence a letter admitted to have been written by Konchick in which Konchick expressed regret in implicating appellant; that with the strain and pressure it put on his mind, he was mentally unbalanced; that he figured on taking off the pressure by dragging appellant into the case and that he was withdrawing any statements implicating appellant. However, in connection with this letter, Konchick testified he made these statements "when he was trying to get him (appellant) off the hook."

It was also brought out by counsel for appellant that Konchick had committed a number of felonies prior to this; that he was a sixth offender; that in a preliminary hearing for Walls, he stated that Walls was not with him on this burglary. The court below fully charged the jury that the testimony of Konchick, an accomplice, be received with caution and that it should be carefully scrutinized; and that because of his commission of a number of felonies, his testimony came from a corrupt and polluted source.

Prior to calling Konchick as the Commonwealth's first witness, appellant's counsel objected to Konchick being sworn and giving any testimony because he allegedly lacked sufficient understanding to comprehend the obligation of an oath. Thereupon the jury was withdrawn from the court room and the court below heard testimony relative to the competency of the witness. This was proper and in accordance with accepted practice: *Commonwealth v. Kosh*, 305 Pa. 146, 157 A. 479; *Commonwealth v. Carey*, 105 Pa. Superior Ct. 362, 161 A. 410.

For the defense, Dr. Max Rossman, a psychiatrist, was called who testified that he examined the witness on two different occasions and that based on these examinations, exhibits shown to him, together with hearing the witness testify at a previous trial of this cause, he was of the opinion that Konchick did not comprehend the obligation to tell the truth; that sometimes he could discriminate between true facts and untruths; that he could not distinguish between right and wrong; that at times he could be telling the truth and at other times it could be pure fabrication and that the witness is a pathological liar.

It is interesting to note that previous to this testimony, Dr. Rossman furnished a written report to the court below on this same witness in which he concluded from his examination that "I am unable, at this time, to classify him as psychotic. In my opinion he is a sociopath with some mental deterioration, possibly due to some brain damage. In my opinion he is not feeble-minded and can only be regarded as a responsible agent."

The other defense witness was J. D. Sherer, a clinical psychologist, who stated that Konchick tells the truth as he sees it but, because of his abnormal personality, his concept of truth is not the same as that

with so-called normal personality; that he cannot freely choose between truth and falsehood; that what he may say may be the truth and may not be the truth and that in ordinary things, he is able to differentiate between right and wrong.[1]

In contradiction of the foregoing testimony, the Commonwealth called Dr. S. M. Lessee, a psychiatrist, who classified Konchick as a psychopathic personality without delusions or hallucinations, not psychotic, not mentally defective and not legally insane. He further testified that there was no evidence of his being disoriented for time, place, or person and that he could give a factual account of things; that he understood the meaning of an oath and that he comprehended the obligation of an oath and that he was able to differentiate between right and wrong. In addition, the court below called Konchick himself to the stand and, in the light of a series of questions and answers, the court concluded that he understood the meaning and obligation of an oath; that in view of the conflicting opinions of the two psychiatrists as to competency, the court concluded that he was competent and permitted him to testify.

On this appeal, the objection is not directed to the finding of the court as to competency but rather to the failure of the court to present to the jury the expert testimony received at the preliminary hearing to show that Konchick was a pathological liar. The question

---

[1] We do not accept the premise that psychologists are qualified to express medical opinions in regard to whether one can tell the truth or not. Their functions, in a large measure, deal with measurement and interpretation of mental capacities and derivatives. The art is practiced by non-medical persons whose field of endeavor, although very helpful, is totally different from the practice of psychiatry. See Roche: Truth Telling, Psychiatric Expert Testimony and the Impeachment of Witnesses, 22 Pa. Bar Ass'n. Quarterly, 140-153.

of the competency of a witness is one for the court and such finding cannot be disturbed on appeal unless there is an abuse of discretion by the court: *Commonwealth v. Kosh,* supra; see also 28 R.C.L. sec. 36; 58 Am. Jur., Witnesses, sec. 212.

Whether this testimony should have been presented to the jury is another question. The record discloses that this matter was not raised in the motion for a new trial and is raised here for the first time. We have held that such a question is not properly before us under such circumstances. *Commonwealth v. Patrick,* 174 Pa. Superior Ct. 593, 101 A. 2d 139; *Commonwealth v. Di-Carlo,* 174 Pa. Superior Ct. 611, 101 A. 2d 410.

However, an examination of the testimony and the entire record reveals no basis upon which this testimony, as a matter of law, should have been presented to the jury. The jury was concerned with questions of credibility and not of competency. In view of the conflict in the testimony of the two psychiatrists called for the purpose of aiding in the determination of *competency,* any submission of their testimony to the jury would have involved the credibility of the *psychiatrists* which was not a jury issue involved in the case. Such question of competency cannot be shifted to a jury except in those cases where some question of *fact* (as distinguished from opinion) may not only affect competency but credibility as well.[2] And in such cases, the

---

[2] Intoxication on a part of a witness at the time of an occurrence about which the witness has testified is a proper matter for the consideration of a jury as affecting his credibility. *Commonwealth v Godfrey,* 177 Pa. Superior Ct. 640, 112 A. 2d 434. In *United States v. Hiss,* 88 F. Supp. 559, the court held that the existence of insanity or mental derangement is admissible for the purpose of discredition a witness, holding that "evidence of insanity is not merely for the judge on the preliminary question of competency but goes to the jury to affect credibility." See also III Wigmore on Evidence (3rd Ed.), secs. 931, 932, 935, 997b, 998b.

matter may be submitted to a jury only so far as those facts might affect credibility. Here, however, the question involved was not whether the witness had defective powers of observation, or of recollection, or of communication, but rather whether the witness could tell the truth if permitted to testify and whether he understood the obligation of an oath to tell the truth. No one has hinted at the insanity of this witness.

The inherent right of the court preliminarily to determine the competency of a witness cannot be delegated to psychiatrists. As stated in *Commonwealth v. Patskin*, 375 Pa 368, 100 A. 2d 472:

"This is a sound and wise provision. . . . This and similar testimony as to insanity in many other homicide cases justify the rule or axiom that in such cases expert testimony is entitled to little weight as against positive facts."

What are the positive facts in this case? The trial court saw and heard not only the experts but also the witness himself to observe and pass upon the weight to be given their respective testimony. As stated by the court below, the "case was tried twice and at each trial Konchick gave substantially the same testimony." While there were contradictions and inconsistencies, the witness did not change his story on the salient facts of the case. He was corroborated to a material degree by the testimony of other Commonwealth witnesses. His testimony was not that of a pathological liar.

Any testimony offered by experts is merely advisory and not mandatory upon the court. It is the court, and not the psychiatrists, which must be satisfied with the competency of the witness. *Commonwealth v. Patskin*, supra. We are satisfied that under the circumstances here presented, the trial court committed no fundamental error in failing to submit such expert testimony to the jury without a specific request. Such testimony

would have served only to cloud the issue to be determined by the jury. The record is significantly silent on any offer of such testimony or request for the submission of such testimony to the jury. It would be anomalous, indeed, to charge the trial court with the responsibility of determining competency only to have the testimony upon which that determination is based submitted to the jury. And to charge the court with fundamental error in failing to do so is equally an anomaly which this Court refuses to accept.

There is another consideration. As previously mentioned, the testimony of Sergeant Swan brought forth admissions on the part of appellant which, unexplained, were damaging. Even if we were to eliminate all of the testimony of Konchick, this testimony would be sufficient to sustain conviction. True, the admissions could have been explained away, but the failure of appellant to take the stand and offer testimony only strengthened the admissions testified to by Sergeant Swan.

There remains one other complaint. Appellant states that he was prejudiced by the trial court's refusal to permit disclosure of the whereabouts of an alleged accomplice, Frank Walls. During the cross-examination of Sergeant Swan and Corporal Dougherty by appellant's counsel, the question was asked whether Frank Walls was under arrest. An objection to this question was sustained which is assigned as error.

The record discloses that counsel for appellant was present at the alderman's hearing involving Walls in this burglary. Evidence as to the whereabouts of Walls was equally available to appellant as to the Commonwealth. Whether Walls was free or under arrest was wholly irrelevant to the issue being tried. The prosecution is not required to call an eyewitness where it has reason to believe that the witness is unbelievable.

*Commonwealth v. Thurman*, 167 Pa. Superior Ct. 642, 76 A. 2d 483. Furthermore, no duty rests upon the state police to supply information whereby appellant could test the credibility of the Commonwealth's own witnesses. *Commonwealth v. Friday*, 171 Pa. Superior Ct. 397, 90 A. 2d 856.

Judgment affirmed.